**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger**

Civil Action No. 17-cv-03046-MSK-KLM

**ROBERT J. RUIZ,**

     **Plaintiff,**

**v.**

**WOODWARD, INC.,**

     **Defendant.**

---

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendant's ("Woodward") Motion for Summary Judgment **(# 34)**, Mr. Ruiz's response **(# 39)**, and Woodward's reply **(#42)**; and Mr. Ruiz's Motion for Partial Summary Judgment **(# 35)**, Woodward's response **(# 38)**, and Mr. Ruiz's reply **(# 43)**. Also pending are several unopposed motions **(## 37, 41, 45)** seeking to restrict public access to certain filings, and Mr. Ruiz's motion **(# 46)** to substitute a signed affidavit for an unsigned one.

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis. Mr. Ruiz was employed by Woodward as a Global Supply Manager ("GSM"). GSMs are responsible for managing Woodward's relationships with its domestic and international suppliers, including negotiating contracts, attending meetings, and addressing any production issues the suppliers might experience. Often times, these tasks are performed at various Woodward offices or suppliers' locations, which requires GSMs to engage in significant

domestic and international travel.  The exact extent to which such travel is required is disputed and discussed in more detail below.

Mr. Ruiz suffers from renal cell carcinoma, a type of cancer that affects his kidneys.  He had a kidney removed in or about 2007, and since then has continued to suffer from chronic kidney disease and hyperpohospatemia (high phosphate levels in the blood, a sign of poor kidney function).  The extent to which this condition affects Mr. Ruiz's activities of daily living are also in dispute and discussed in more detail below.

On May 10, 2016, Dr. Rubin, one of Mr. Ruiz's treating medical providers, issued a letter stating:

> I have concerns about [Mr. Ruiz's] travel to Mexico.  Both from a general stress as well as an environmental stress perspective. Travel causes Mr. Ruiz to unfavorably augment his exercise routine as well as interrupts the continuum of his diet.  To boot, he is exposed to toxic chemicals such as solvents which cause endocrine disruptions[ ] and may be at the root of his current endocrine disruptions.  Moreover, Mr. Ruiz has only one kidney to help remove these chemicals from his blood, leaving him at a disadvantage and thus a higher overall body burden.  I would propose a travel restriction over the next 6 months.

Woodward's Human Resources department discussed Dr. Rubin's letter, but took no immediate action.  Mr. Ruiz also provided the letter to Mark Alvis, his direct supervisor.  Mr. Alvis immediately advised Woodward's HR department that Mr. Ruiz "does not have any travel plans for the near future and, at this point, I will not ask him to [travel]."

At roughly the same time as the letter was considered, an issue arose with a Woodward supplier named Hubbell located in Monterey, Mexico.[1]  Because GSMs are expected to tend

---

[1]    It is not clear whether Mr. Ruiz's need to travel to Hubbell in Mexico was scheduled (as Dr. Rubin's letter seems to suggest) or whether it was unexpected and emergent (as Mr. Alvis' letter stating that Mr. Ruiz had no "travel plans" at the time suggests).  This discrepancy does not affect the analysis herein.

personally to the needs of their assigned clients, Mr. Ruiz would be responsible for traveling to Hubbell's location. But Mr. Alvis, mindful of Mr. Ruiz's health concerns, instructed another GSM to travel to Hubbell instead.

In late June 2016, Woodward finally addressed Dr. Rubin's letter. Woodward requested that Mr. Ruiz meet with Dr. Mull, a Woodward corporate physician. At the conclusion of an appointment on June 27, 2016, Dr. Mull requested that Mr. Ruiz obtain more information from his physician about his condition and any possible restrictions. The next day, Mr. Ruiz produced a letter from his nephrologist, Dr. Simmons, that stated:

> You face travel-related risks to your kidney if you develop dehydration from excessive sweating or traveler's diarrhea. A safe food and water supply and an air-conditioned work environment is essential. You are at risk of developing overt diabetes if you eat a high carbohydrate-high fat diet, gain weight and do not engage in regular exercise. . .
>
> From the kidney viewpoint, whether or not you can travel for work depends on the circumstances of individual trips. If you are staying at an air conditioned hotel and working in an air conditioned facility where you receive liquids and meals from vendors that meet the health department requirements of commercial restaurants in the United States then you can travel and work there as long as you have regular work hours and mealtimes. The same requirements apply both domestically and internationally. They are life long. I recommend that you speak with your supervisors concerning the details of individual trips in deciding what is acceptable. I cannot provide blanket approval or restrictions since it depends on the specifics of a trip as I have described above.

Within a day of receiving Dr. Simmons' letter, Dr. Mull prepared his own report that stated that Mr. Ruiz "[m]ay travel to 1st world countries and domestically. Must have air conditioned work space and lodging. Food and liquids must meet commercial standards of the United States." Dr. Mull's report notes that these restrictions are permanent, although Mr. Ruiz disagreed – Mr. Ruiz believed that a six-month restriction was all that was required.

On July 18, 2016, Mr. Ruiz completed a Reasonable Accommodation Request Form.  He indicated that he was requesting "no travel outside of the U.S. and limited [travel] in U.S.," explaining that "excessive travel and travel outside of U.S. causes extreme harm to my body.  It increases my health risks." Mr. Ruiz further mentioned "stress from travel and exposure to manufacturing chemicals . . . that exists in 3d world countries and many domestic manufacturing facilities. . .  increases my risk for both kidney dialysis and kidney failure since I have only one kidney.  Furthermore, stress from travel and unsanitary exposure that exists in 3d world countries and domestic locations which do not meet U.S. E.P.A. standards will cause life limiting harm."

Woodward's HR department then had Mr. Alvis prepare a document identifying Mr. Ruiz's expected travel obligations for the next year (the "Travel Requirements Document").  Mr. Alvis identified 8 suppliers -- 5 domestic and  one each in Mexico, the UK, and France – that Mr. Ruiz would be expected to visit at least once in the upcoming year.  In addition, he estimated that there might be two unexpected "crisis/triage events" requiring Mr. Ruiz to travel to any supplier. Woodward asked Mr. Ruiz to address the Travel Requirements Document, and Mr. Ruiz indicated that he believed he could travel to two of the suppliers -- one in Wisconsin and one in Wyoming -- with certain accommodations (*i.e.* "office only, no exposure to manufacturing [floor] because of chemicals").  But he stated that no accommodations would allow him to travel to any of the other six suppliers.  In most instances, Mr. Ruiz's objections to traveling to the suppliers was based on his exposure to chemical or environmental contaminants and the fact that travel outside of the Mountain time zone would require him to disrupt his morning exercise routine.  *See* Docket # 39-8 at 3 (refusing to travel to supplier in Western New York because "sale baths, chemicals, varnishes being used.  Ventilation system [ ] poor. . . A/C in offices, can't recall on manufacturing floor.  . . Two hour time zone difference would require that I get up at

3:30 MT to exercise before supplier visit . . . I cannot travel to this supplier with or without a reasonable accommodation") and at 4 (refusing to travel to supplier in U.K., despite never having been to the facility in question, because "Definitely no time for exercise while traveling . . . I cannot travel to this supplier with or without a reasonable accommodation.").

A few days later, Mr. Ruiz met with HR representative Amy McNaughton to discuss possible accommodations. Ms. McNaughton proposed several accommodations to address the concerns raised in Dr. Rubin and Dr. Simmons' letters, as well as the issues raised by Mr. Ruiz in the Travel Requirements Document. Among the accommodations suggested by Ms. McNaughton were limited working hours when traveling and Mr. Ruiz's use of a ventilator mask when working in chemical-polluted areas. Mr. Ruiz responded that he did not believe those accommodations would be sufficient, although the record does not clearly identify his reasons.[2] Mr. Ruiz testified at his deposition that he proposed alternative potential accommodations, including having suppliers travel to Colorado instead of him traveling to them, conducting supplier meetings by telephone or videoconference, and having other GSMs engage in necessary travel on his behalf for the six-month period that he believed an accommodation was necessary. It is not clear what response, if any, Ms. McNaughton or Woodward had to these proposals. Ms. McNaughton and Mr. Ruiz then discussed the possibility of Mr. Ruiz looking for vacant positions at Woodward, but no available positions matched Mr. Ruiz's qualifications and preferences and he chose not to apply for any other openings.

---

[2]     With regard to the ventilator mask, Mr. Ruiz testified variously that he "could not wear it" because it interfered with his ability to communicate and look through microscopes; that he could wear a ventilator but "didn't think it was the best accommodation"; and that he "cant say whether [he] would or wouldn't" wear one, "because it depends on the circumstances of the trip."

Although there is some dispute as to when the decision was first announced, it is undisputed that in or about early August 2016, Woodward concluded that it could not accommodate Mr. Ruiz's restrictions. Thus, Woodward terminated Mr. Ruiz's employment.

In this action, Mr. Ruiz asserts five claims: (i) that his termination was the result of discrimination against him on the basis of his disability in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; (ii) discriminatory failure to hire, in that Woodward refused to consider Mr. Ruiz for other open and available positions due to his disability, in violation of the ADA; (iii) failure to accommodate Mr. Ruiz's disability, in violation of the ADA; (iv) retaliation for having engaged in protected activities – namely, for having requested an accommodation – in violation of the ADA; and (v) age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. (Mr. Ruiz has since withdrawn his age discrimination claim.)

Both Woodward and Mr. Ruiz now move for summary judgment. Woodward's motion **(# 34)** argues that: (i) Ruiz cannot show that he is "disabled" under the ADA because he is not substantially limited in a major life activity; (ii) Mr. Ruiz cannot show that he was "qualified" for his position because he was unable to perform, with or without an accommodation, the essential function of traveling to suppliers' locations; (iii) that Mr. Ruiz cannot show that he was discriminatorily rejected from any open positions because he never actually applied for such positions; and (iv) Mr. Ruiz cannot establish that he was subjected to an adverse employment action (other than termination) that would support his retaliation claim and cannot demonstrate that any such action was a pretext for retaliation. Mr. Ruiz's motion **(# 35)** seeks summary judgment in his favor on his failure to accommodate claim, as well as on Woodward's affirmative defenses of failure to exhaust, failure to mitigate damages, waiver, and estoppel.

## <u>ANALYSIS</u>

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

**B. Woodward's motion**

The Court begins with Woodward's motion for summary judgment. Because all of Mr. Ruiz's ADA claims require proof that Mr. Ruiz is both "disabled" and "qualified," as those terms are defined in the ADA, the Court begins with those inquires.

1. Definition of "disability"

The ADA's protections extend to individuals who have a "disability." 42 U.S.C. §

12112(a).  To have a "disability," and individual must have either (i) a physical or mental impairment that substantially limits one or more major life activities, (ii) a record of such an impairment, or (iii) been regarded by others as having had such an impairment.  42 U.S.C. § 12101(1).  The ADA defines "major life activities" as actions such as "seeing, hearing, eating, sleeping," and so on.  42 U.S.C. § 12102(2)(A).  But the statute also provides that the term "major life activities" also includes "the operation of a major bodily function," including the operation of bodily systems such as the respiratory, circulatory, and immune systems, as well as "normal cell growth."  42 U.S.C. § 12102(2)(B).

An individual is "substantially limited" in a life activity when that person's ability to perform the activity is significantly impaired as compared to "most people in the general population."  29 C.F.R.  1630.2(j)(1)(iii).  The question of whether an individual is "substantially limited" in a life activity must be "construed broadly in favor of expansive coverage," as "'substantially limits' is not meant to be a demanding standard."  29 C.F.R.  1630.2(j)(1)(i).  The assessment of whether an individual is substantially limited in a major life activity is made without regard to the ameliorative effects of medications or other accommodations or adaptive behaviors.  42 U.S.C. § 12102(4)(E)(i)(I)-(IV).

In its guidance interpreting the ADA, the EEOC has identified certain types of conditions that "will, at a minimum, substantially limit the major life activities," including cancer, because it "substantially limits normal cell growth"; diabetes, because it "substantially limits endocrine function"; and epilepsy, because it "substantially limits neurological function."  29 C.F.R. § 1630.2(j)(3)(iii).  At the same time, the 10th Circuit explains that "there is no 'per se' disability." *Scavetta v. Dillon Companies, Inc.*, 569 Fed.Appx. 622, 625 (10th Cir. 2014).  Merely having a condition listed above (or an equivalent) does not, of itself, constitute a "disability"; rather, "an

individualized assessment is still required to determine whether an impairment substantially limits a major life activity." *Id.* And "the question of whether an impairment substantially limits a major life activity is ordinarily a question for the jury." *Id.* In *Sacvetta*, for example, the plaintiff employee requested an instruction informing the jury that they could find her to have a disability simply because she had been diagnosed with rheumatoid arthritis, which, she argued, was a condition that substantially impaired the "major bodily function" of her nervous system. The trial court refused to give that instruction and the 10th Circuit affirmed. It found that there was evidence in the record about rheumatoid arthritis' effect "on the immune system of [ ] patients in general" and about how the disease can result in deteriorating joints and bones. But the 10th Circuit found that "there was no specific evidence that [rheumatoid arthritis] substantially limited the operation of <u>Scavetta</u>'s bodily functions." 569 Fed.Appx. at 625-26 (emphasis added). *Scavetta* thus teachers that the inquiry focuses on the <u>specific effects</u> that the disease has <u>on the plaintiff him- or herself</u>, not on the general effects that the population suffering the disease tends to experience.

At his deposition, Mr. Ruiz identified several particular life activities that his condition affects. He testified that his sleep is disrupted because "I'm up two, maybe three times a night . . . to urinate." He also testified more generally that his excretory functions were "greatly" affected because he "cannot wander too far from a bathroom" and that he had to go to the bathroom "every hour and a half to two hours." He testified that his walking was limited, insofar as he sometimes experiences "side stitches" while walking, and that this impaired his ability to exercise. More specifically, Mr. Ruiz testified that he was an avid exerciser, frequently lifting weights, running, and doing push ups. He stated that, due to his kidney condition, he cannot exercise as vigorously as he used to, giving the example that he can presently "do a hundred

[push-ups], but I should be able to do 200."  He also testified that he could walk three to four miles without difficulty and that he could jump rope for a period of 40 minutes as frequently as twice per day.  As to the activity of breathing, Mr. Ruiz testified that he "can't say [it] was substantially [limited]" by his disease, but he did stated that "sometimes I can't take a deep breath on a walk like I used to" after a few miles.  And he stated that his condition does affect his ability to engage in "the quick sports" like softball and basketball, which Mr. Ruiz can "no longer do [ ] because I just didn't have the stamina or breath to take me through those sports."  Mr. Ruiz conceded that the activity of concentrating is not limited by his disease, other than his residual anxiety about whether his cancer might spread.

The Court finds that there is a genuine dispute of fact requiring trial as to whether Mr. Ruiz is "substantially limited" in the major life activity of sleeping, as well as whether his excretory system is substantially limited by his impairment.[3]  As noted above, the Court is required to construe the "substantially limited" inquiry in favor of finding coverage under the ADA, and the question of whether an individual is substantially limited in a major life activity has been recognized by the 10th Circuit as typically involving questions of fact.  Thus, only in the most obvious of cases will the Court grant summary judgment to an employer on the "substantially limited" element.  Here, there is no particular evidence in the record as to how many times members of the general public are usually awakened by the need to urinate each

---

[3]      The Court has substantial doubt as to whether Mr. Ruiz's own testimony would suffice to support contentions that he is substantially limited in the major life activities of walking, breathing, concentrating, or exercising.  In these respects, Mr. Ruiz himself acknowledged that he was not substantially limited in these activities or described a present ability to participate in such activities at least as vigorously (if not more so) than most members of the general public.  Nevertheless, because the Court finds a triable issue as to Mr. Ruiz's limitations in other major life activities, it need not make specific findings as to the remaining activities Mr. Ruiz's identifies.

night, making it impossible for the Court to conclude that Mr. Ruiz being awakened two to three times each night for such purposes is or is not consistent with the experiences of the public at large. Although such comparisons "usually will not require scientific, medical, or statistical analysis," *see* 29 C.F.R. § 1630.2(j)(v), the Court cannot conclude that there is a well-recognized consensus among the general population as to how many times per night people are regularly awakened to urinate. Factors such as age, sex, body size, eating and drinking habits, and general overall health are among many that could affect whether a person will routinely be awakened to urinate during the night at all, much less whether such awakenings will usually occur repeatedly. Because Woodward has not come forward with evidence that makes it unambiguously clear that Mr. Ruiz's experiences being awakened to urinate conform to the routine experiences of the public at large, it will be up to the factfinder to decide whether Mr. Ruiz is substantially limited in the major life activity of sleeping. Similarly, because there is evidence as to how impairments in Mr. Ruiz's excretory system has specific practical consequences – *e.g.* affecting his sleeping and requiring him to use the bathroom every two hours (if not more frequently) – this case is distinguishable from *Scavetta*. Accordingly, Woodward's motion seeking summary judgment on Mr. Ruiz's ADA claims on the grounds that Mr. Ruiz is not "substantially limited" in one or more major life activities is denied.

2. "qualified"

To enjoy protection of the ADA, an employee with a disability must be "qualified" to perform the job he or she holds or seeks. 42 U.S.C. § 12111(8); 42 U.S.C. § 12112(a). An employee is "qualified" if he or she "can perform the essential functions of the employment position," with or without a reasonable accommodation. 42 U.S.C. § 12111(8). This inquiry proceeds in two phases: first, the Court must determine whether there is a genuine dispute as to

what the "essential functions" of the job are, and second, the Court must determine whether there is a genuine factual dispute as to whether there is some reasonable accommodation that would allow the employee to be able to perform those functions. *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir. 1995). Mr. Ruiz bears the burden of proof at trial on both issues. *Mason v. Avaya Communications, Inc.,* 357 F.3d 1114, 1119 (10th Cir. 2004).

(a) <u>travel as an essential function</u>

The "essential functions" of a position are "the fundamental job duties of the employment position," standing in juxtaposition to "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see also Milton*, 53 F.3d at 1123 (essential functions are those that "bear more than a marginal relationship to the job at issue"). Functions might be essential for many reasons, including: (i) the position exists for the very reason of performing that function, (ii) the function is highly specialized such that the incumbent in the position is hired for his or her particular expertise or ability in performing the function; or (iii) that there are only a limited number of employees capable of performing the function such that the function can only be distributed among that limited number. 29 C.F.R. § 1630.2(n)(2). Other factors that influence the determination of whether a function is essential include the amount of time the employee spends performing the function, the consequences of not requiring the employee to perform the function, the employer's own judgment of the importance of the function, and the experiences of employees past and present who perform that function. 29 C.F.R. § 1630.2(n)(3).

Here, the parties' dispute turns on the question of whether travel is an essential function of the job of GSM at Woodward. The job description of a GSM mentions that "domestic and international travel [is] required." Although Mr. Ruiz argues that the travel requirement is listed separately in the job description from the section captioned "Essential Functions," it is clear that

travel to suppliers and other meetings is not a "marginal" and unimportant triviality, but rather, is a routine and important part of the GSM position. The record reflects that GSMs, including Mr. Ruiz, traveled with some frequency, typically on the order of 6-12 trips per year. Mr. Ruiz's comments on the Travel Requirements Document identified 8 trips Mr. Ruiz made to suppliers between March 2015 and May 2016, and the record seems to reflect that each such trip consists of at least 2-3 days of travel.

Those trips are occasioned by a variety of demands including contract negotiations, relationship management with suppliers, and travel to address emergent production problems at suppliers, among others. Although there is evidence that some employee groups at Woodward have employees other than GSMs that can perform some of this travel – Ms. Hice testified that "if the trip was for a quality issue, then I could potentially have someone that could go for me because we have a quality engineer in our group"[4] –the record appears to be undisputed that there were many kinds of travel that could only be performed by GSMs themselves. Moreover, and perhaps most importantly, the record amply reflects that Woodward considered that travel to suppliers was an essential component of serving as a GSM. This Court does not second guess an employer's decisions about what functions are and are not essential: "provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it." *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1262 (10th Cir. 2009).

Beyond his argument stemming from travel's placement within the GSM job description, Mr. Ruiz does not offer any meaningful argument that travel was not an essential function of that

---

[4]     Nothing in the record gives any indication that Mr. Ruiz's group had such an individual available.

job.  Mr. Ruiz argues that he traveled relatively infrequently, and that corporate travel policies were tightened as a cost-saving measure during the relevant period, further reducing the incidence of travel.  But even functions that an employee might perform only rarely (or even never) can still be essential functions of a job.  *Mielnicki v. Wal-Mart Stores, Inc.*, 738 Fed.Appx. 947, 950 (10th Cir. 2018).  Similarly, the fact that Woodward had, on some occasions, asked one GSM to handle travel duties that would normally have been assigned to a different GSM does not operate to render the function of work-related travel any less essential.

*Mielnicki* offers the example that although cleaning bathrooms was an essential function of the plaintiff's job as a maintenance associate, the employer had previously assigned other maintenance associates to perform that task instead of the plaintiff.   When the supply of maintenance associates dwindled and the employer then instructed the plaintiff to clean bathrooms, the plaintiff objected, contending that cleaning bathrooms was not an essential function of her position.  The Court of Appeals explained that "Walmart excused her from performance an essential function of the position even though it was not required to do so.  An employer that goes beyond what is required under the ADA to permit an employee to perform only some of the essential functions of the position is not then estopped from insisting [later] that the employee perform all the essential functions of her job."  738 Fed.Appx. at 950.

Thus, here, the fact that Woodward sometimes allowed or assigned one GSM to perform the travel obligations that were normally assigned to another GSM does not operate to make travel a non-essential function of the job of GSM.  Accordingly, the Court finds that there is no genuine dispute of material fact as to whether occasional travel to suppliers' locations was an essential function of the job of GSM.

(b) accommodation

There can be no dispute that Mr. Ruiz was unable to perform the essential GSM function of traveling to suppliers' locations without any accommodation. All three physicians opining about Mr. Ruiz's condition believed that some accommodations to his travel obligations were necessary, and Mr. Ruiz's own responses on the Travel Requirements Document make clear that he believes that accommodations were necessary to permit him to travel to even the two suppliers he believes he could continue to service.

Mr. Ruiz argues that there were reasonable accommodations that, if extended, would have permitted him to perform the essential function of traveling. During his meeting with Ms. McNaughton, he proposed three potential accommodations, all of which would remain in place for period of six months (after which, Mr. Ruiz believed, he might be able to resume traveling without any restrictions or accommodations): (i) "[his] peers going to some of the suppliers" instead of Mr. Ruiz, as Mr. Ruiz testified that "there were co-workers/peers [of his] that were willing to do [his] traveling based on a six-month restriction"; (ii) "suppliers coming in-house," insofar as Mr. Ruiz represented that "I had called the suppliers and the suppliers were willing to meet me in [Colorado]"[5]; and (iii) "when suppliers are['nt] willing to come here, we can do teleconferencing" to address supplier problems. In response, the evidence appears to indicate

---

[5]     Mr. Ruiz's first two proposed accommodations assert facts – that his co-workers were willing to travel on his behalf, and that his suppliers were willing to travel to Colorado – that are based on hearsay. Mr. Ruiz has not come forward with evidence such as affidavits or deposition testimony from these persons, attesting that they would indeed volunteer to assist in accommodating Mr. Ruiz's restrictions. The absence of such evidence would seem to require the Court to ignore Mr. Ruiz's contention that he can show that his proposed accommodations were indeed viable. Nevertheless, for the reasons set forth herein, the Court need not consider that issue.

that Ms. McNaughton proposed two other alternatives: a ventilator mask that Mr. Ruiz could wear when working in supplier locations that had chemical or other air quality hazards, and shortened work hours when traveling that would minimize (but not eliminate) disruption of Mr. Ruiz's exercise schedules. (A third accommodation, requiring that Mr. Ruiz only work in air conditioned portions of suppliers' locations, seems to have been accepted by both sides.)

The juxtaposition of Woodward's proposed accommodations and those requested by Mr. Ruiz demonstrate the flaw in Mr. Ruiz's argument. The accommodations proposed by Ms. McNaughton are those that address the hazards that Mr. Ruiz anticipated encountering when he traveled, ostensibly making it safer for Mr. Ruiz to perform the essential function of traveling. Mr. Ruiz's proposed accommodations, on the other hand, seek to <u>replace</u> the function of traveling with an alternative method of performing his work. Mr. Ruiz's proposed accommodations do not make travel safer; they eliminate his need to travel. In other words, Mr. Ruiz seeks to entirely remove the essential function of travel from his job description.

The 10th Circuit has repeatedly made clear that a proposed accommodation that reallocates or removes essential functions from an employee's job is not, as a matter of law, a "reasonable" accommodation. *See Gardenhire v. Manville*, 722 Fed.Appx. 835, 839 (10th Cir. 2018) ("an employee's request to be relieved from an essential function of his position is not, as a matter of law, a reasonable or even plausible accommodation"). Even where other employees volunteer to assume a disabled employee's essential functions, the employer is not required to accept their offer and may insist upon having the disabled employee perform those functions; to hold otherwise would compel the employer to reallocate an essential function.[6] *See e.g.*

---

[6] For example, if Woodward was required to accept Mr. Ruiz's request to have co-workers perform his travel duties for him, some duties would have to be reassigned from the co-workers (to avoid overburdening them now that they are also assuming Mr. Ruiz's travel duties) to Mr.

*McMackins v. Elk Grove Unif. School Dist.*, 21 F.Supp.2d 1201, 1205 (E.D.Ca. 1998).

Although an employer is not required to reallocate essential functions as an accommodation, the ADA provides that an employer may be required, as a reasonable accommodation, to "restructure a job by altering when and/or how an essential function is performed." *See Interpretive Guidance on Title I of the Americans With Disabilities Act*, Appendix to 29 U.S.C. Part 1630. The guidelines give the examples that "an essential function customarily performed in the early morning hours may be rescheduled until later in the day" or that, for "an employee with a disability that inhibits the ability to write," and accommodation that "permit[s] the employee to computerize records that were customarily maintained manually" might be required. *Id.* Here, for example, Mr. Ruiz's request to communicate with suppliers via teleconference, rather than traveling to their location, is arguably akin to the guidelines' example of an employee that wished to use a technological approach – computerizing records, communicating with suppliers by telephone – rather than performing a task manually (*e.g.* manual recordkeeping, in-person travel).

In addressing this concept under the conceptually-similar Rehabilitation Act, *Yonemoto v. McDonald*, 114 F.Supp.3d 1067, 1118 (D.Hi. 2015), explained that the question of whether an essential function can be restructured "focuses on the purpose of the function and the result to be accomplished rather than the manner in which the function presently is performed." (Emphasis in original.) It adds that "the manner in which an employee performs a particular duty should be considered 'essential' only where the manner and substance are one and the same." *Id.* In this context, the question is whether it is appropriate to require Woodward to restructure the manner

_____

Ruiz (who suddenly has more available work time when his travel duties are eliminated). This further highlights the unreasonableness of a proposed accommodation that recruits co-workers to perform a disabled employee's essential functions.

in which Mr. Ruiz would perform the essential function of traveling, so long as that restructuring preserves the purpose of the travel.

Here, the record suggests that GSMs travel for two primary purposes. First, there are scheduled trips to suppliers to address matters such as contract negotiations or trips to other Woodward locations to attend meetings. The distinguishing characteristic of this type of travel is that the need to travel can be anticipated. The Travel Requirements Document that Mr. Alvis prepared identifies several of these types of trips that Mr. Ruiz would be expected to make in the 18 months following mid-2016, including "many trips to close [a] contract" at a supplier in Wyoming and "relationship management" trips to suppliers in New York and Arizona, among others. The second type of travel is unexpected and emergent, such as when production or other problems at suppliers threaten the flow of goods to Woodward. In this context, a GSM is immediately dispatched to the supplier to deal with the issue. Mr. Alvis' Travel Requirements Document characterizes these types of trips as "crisis/triage events." Because these types of events are unpredictable, Mr. Alvis could estimate that they might require Mr. Ruiz to make "two trips over the next 12 months," but could not predict when or where those trips might be.

As noted above, Mr. Ruiz proposed that his travel restrictions be accommodated by having suppliers travel to Woodward's offices in Colorado for meetings, rather than Mr. Ruiz traveling to the suppliers' locations. Mr. Ruiz also proposed the possibility of conducting supplier meetings by telephone. With regard to scheduled and anticipated travel, such accommodations might suffice to serve Woodward's purposes – namely, to advance the ordinary business of its relationship with its suppliers. Most notably, Ms. Hice testified that she was able to use conference calls to meet with suppliers, "depending on the subject matter. In contract negotiations or discussions, then conference calling is okay." But the record does not reflect that

conference calling or suppliers traveling to Colorado was an effective means of addressing Woodward's purposes when it came to emergencies involving supplier disruptions. Ms. Hice stated that when "production issues and quality issues on [suppliers' manufacturing] lines" were involved, "conference calling is not effective." Similarly, Mr. Alvis' affidavit states that "when a supply disruption problem occurs, the [GSM] may need to be onsite [at the supplier] to be able to discern what the problem is and what action needs to be taken."[7] Mr. Alvis goes on to state that "a [GSM] who is not allowed to travel would not be able to effectively manage his/her supply base, including crisis management." This evidence suggests that emergency "crisis/triage events" cannot be handled by conference calls or having the supplier travel to Colorado, and that only the GSM traveling to the supplier's location will suffice to serve Woodward's purposes in such situations.

Notably, although Mr. Ruiz testified that he believed that having suppliers come to him or having conference calls with suppliers would be a reasonable accommodation of his travel duties, he did not explain how he believed that those accommodations would permit him to handle a crisis/triage event that required the GSM to view and address a supplier's manufacturing lines. Because Mr. Ruiz also proposed an accommodation that had other GSMs travel to suppliers on his behalf, the reasonable inference is that Mr. Ruiz recognized that not all supplier issues could be addressed via conference call or by having the supplier travel to Colorado. As noted above, the insistence that other GSMs cover for his emergency travel is, as a matter of law, not a reasonable accommodation. But without that alternative, Mr. Ruiz has not

_____

[7]     Mr. Ruiz notes Mr. Alvis' use of the word "may" in the quoted text, suggesting that travel to the supplier is necessarily at the option of the GSM involved. The Court reads Mr. Alvis' statement as suggesting that some situations might not require the GSM to travel, but others will.

proposed a package of accommodations that meets one of the primary purposes of Woodward's requirements that GSMs travel: to attend to crisis/triage events that can only effectively be handled through the GSM's personal appearance at the supplier's location.

Thus, the Court finds that Mr. Ruiz has not carried his burden of demonstrating a triable issue of fact as to whether there was a reasonable accommodation that could allow him to perform the essential function of traveling. As a result, Mr. Ruiz was not a "qualified" individual with a disability, and thus, he was not covered by the ADA. Woodward is therefore entitled to summary judgment on all of Mr. Ruiz's ADA discrimination and failure to accommodate claims.

### 3. ADA retaliation

Mr. Ruiz's claim that he was retaliated against for exercising rights under the ADA does not require a showing that he was disabled, and therefore survives the foregoing analysis.

To establish a claim for retaliation under the ADA, Mr. Ruiz must initially demonstrate a *prima facie* case of retaliation by showing: (i) that he engaged in conduct protected by the ADA; (ii) that he suffered an adverse employment action; and (iii) that there is a causal connection between the protected conduct and the adverse action. If Mr. Ruiz carries that burden, Woodward must articulate a legitimate, non-retaliatory reason for the adverse action and Mr. Ruiz bears the ultimate burden of proving that Woodward's proffered reason is a pretext for retaliation. *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 995 (10th Cir. 2019). Woodward moves for summary judgment on this claim, arguing that Mr. Ruiz cannot show that he suffered an adverse employment action and cannot show that Woodward's proffered reason is pretextual.

In the retaliation context, an adverse employment action is one that would be sufficient to

chill an employee of ordinary firmness from engaging in protected conduct. *Burlington Northern R.R. Co. v. White*, 548 U.S. 53, 68 (2010). Here, Mr. Ruiz alleges that he suffered two adverse employment actions: (i) that Woodward unreasonably delayed in responding to his request for an accommodation, taking over 5 weeks from the submission of Dr. Rubin's letter before beginning the process of considering any accommodations, and (i) that Woodward ultimately terminated him.

The Court finds that, on the facts presented here, the delay in addressing Dr. Rubin's letter does not, as a matter of law, constitute an adverse employment action. Although Mr. Ruiz is correct that more than 5 weeks passed before Woodward asked Mr. Ruiz to meet with Dr. Mull to clarify his restrictions – a delay that Woodward attributes to Mr. Alvis being on leave for several weeks and thus unable to participate in initial discussions of the issue -- the record is undisputed that Woodward took some action almost immediately upon receiving Dr. Rubin's letter. It is undisputed that Mr. Alvis received Dr. Rubin's letter (or at least notice of its contents) shortly after Mr. Ruiz's delivered it to Woodward, and Mr. Alvis immediately informed his superiors that Mr. Ruiz was not presently scheduled for any travel and that Mr. Alvis "will not ask him to" engage in any further travel. It is also undisputed that, consistent with Mr. Alvis' statement, Mr. Ruiz was not required to engage in any travel after Dr. Rubin's letter. Indeed, when the emergency arose with Hubbell, one of Mr. Ruiz's suppliers, Mr. Alvis asked another GSM to travel to Hubbell and resolve the issue on Mr. Ruiz's behalf. Nothing in the record indicates that Mr. Ruiz was punished or criticized for not traveling during this time frame, that he lost any pay or benefits, or that his other job duties were changed in any way. Mr. Ruiz testified that he considered the 5-week delay to be adverse because it caused him "stress, anxiety of [not] understanding what kind of decision they were going to make." At another point

in his deposition, he testified that the delay caused him damage to his "self-esteem" (otherwise unexplained); "anxiety, severely high"; "just generally depressed, because . . . I went in hoping, seeking some accommodation."

In determining whether a delay in providing a reasonable accommodation constitutes an adverse employment action, the 10th Circuit examines four factors: (i) the length of the delay, (ii) the reasons for the delay, (iii) whether the employer has offered any alternative accommodations while evaluating a particular request, and (iv) whether the employer has acted in good faith. *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1262-63 (10th Cir. 2001). Here, the record reflects that Woodward's 5-week delay in assessing Mr. Ruiz's request was not particularly long, especially in light of the fact that Mr. Alvis provided Mr. Ruiz with the entire accommodation he requested – a complete halt to all travel – while Woodward considered Mr. Ruiz's request. *Compare Selenke*, *id.* (3- and 5-month delays in providing accommodations not sufficiently adverse where employer provided alternative accommodation in the interim and delay was not in bad faith), *citing inter alia Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998) (3-month delay not adverse where employer provided interim accommodation). The evidence of record appears to be undisputed that at least some of the delay was attributable to Mr. Alvis being on leave and unavailable to participate in discussions about accommodating Mr. Ruiz. And Mr. Ruiz has not adduced any evidence that would suggest that Woodward's delay in addressing his accommodation was the result of bad faith, as opposed to more benign explanations like carelessness or institutional inertia.[8] Under these circumstances, Mr. Ruiz has not demonstrated

---

[8]     Mr. Ruiz extensively argues that Woodward failed to follow its own guidelines for responding to a request for accommodation. Although Mr. Ruiz may be correct that Woodward's staff demonstrated unfamiliarity with those procedures or handled them ineptly, Mr. Ruiz has not adduced any evidence that would suggest that Woodward's staff did so <u>intentionally</u>, much less with the purpose of frustrating his request for accommodation.

a triable issue as to whether the delay in addressing his accommodation request constitutes an adverse action sufficient to support his retaliation claim.

As to Mr. Ruiz's contention that his employment was terminated in retaliation for his having invoked rights under the ADA and requesting accommodations, the Court will assume, without necessarily finding, that Mr. Ruiz can demonstrate a *prima facie* case of retaliation. But Woodward has proffered a legitimate, non-retaliatory reason for that termination: that by Mr. Ruiz's own self-reporting, he was unable to perform the essential functions of his job as GSM, with or without accommodation, and that he was not qualified for or interested in any other open positions with Woodward. As noted above, Mr. Ruiz has not come forward with evidence that suffices to dispute Woodward's conclusion that he was incapable of performing the GSM position's essential function of travel. Furthermore, Mr. Ruiz has not identified any reasonable accommodation that would have permitted him to perform all of the essential functions of the GSM position. Mr. Ruiz argues that Woodward should have done more to help him locate an alternative position within the company and speculates that, because the company was undergoing a reorganization, there was the possibility that unidentified positions created in the future might have been available to him. But he has not identified any specific, open position that existed at the time of his termination for which he was qualified and capable of performing. Thus, Mr. Ruiz is unable to show that Woodward's explanation for his termination is a pretext for retaliation. Accordingly, Woodward is entitled to summary judgment on Mr. Ruiz's ADA retaliation claim.

### C. Mr. Ruiz's motion

Because the Court grants summary judgment to Woodward on all of Mr. Ruiz's claims, the issues raised in Mr. Ruiz's motion may be denied as moot. The Court acknowledges,

however, that Mr. Ruiz's motion seeks judgment in his favor on his claim for failure to accommodate under the ADA, and in some respects, Mr. Ruiz's arguments and evidence in support of that motion differ slightly from the arguments and evidence he tendered in response to Woodward's motion. In the interests of ensuring that Mr. Ruiz's claims were given a full and fair hearing, the Court has considered the arguments and evidence in Mr. Ruiz's own summary judgment motion when evaluating Woodward's motion with regard to Mr. Ruiz's eligibility for coverage under the ADA, and the discussion above incorporates both of Mr. Ruiz's submissions on that point.

### D. Motions to restrict

Mr. Ruiz has filed three motions **(# 37, 41, 45)** that request to have certain exhibits to his summary judgment filings restricted from public access pursuant to D.C. Colo. L. Civ. R. 7.2. The motions are described more fully below. The Court will not recite at length the standard that governs motions to restrict, except to note that there is a strong public interest in having access to materials that were presented to and considered by the Court in making rulings, and that the party seeking to restrict access bears the significant burden of demonstrating that individual privacy interests in non-disclosure are sufficient to outweigh the substantial public interest in access. *See generally Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 754-55 (10th Cir. 2009). Local Rule 7.2 requires a party seeking to restrict access to make several specific showings, including: (i) demonstrating why the private interest outweighs the public one, (ii) identifying a "clearly defined and serious injury that would result if access is not restricted," and (iii) showing why alternatives to restriction, such as redaction or summarization, would not be effective in avoiding the need for outright restriction. D.C. Colo. L. Civ. R. 7.2(c)(2)-(4). With these principles in mind, the Court turns to the particular motions.

1. <u>Docket # 37</u>

In this motion, Mr. Ruiz requests that six exhibits attached to his own summary judgment motion be restricted. These exhibits are filed at Docket # 36. Of those six exhibits, five are medical records of various types, and the remaining exhibit appears to be a list of Woodward suppliers.

As to the medical records, the Court finds that two, Exhibit 3 and Exhibit 4, are not appropriate for restriction. Exhibit 3 is a version of Dr. Rubin's letter, and Exhibit 4 is a version of Dr. Simmons' letter, both of which were provided by Mr. Ruiz to Woodward and which are central to the issues in this case. The Court finds that Mr. Ruiz's privacy interests in concealing information about his own health condition does not overcome the strong public interest in understanding the pertinent facts of this case, particularly insofar as the letters were specifically intended by Mr. Ruiz's doctors to be disclosed to others. Accordingly, the Court denies Mr. Ruiz's request to restrict access to Docket # 36-2 and 36-3.

The remaining medical records have a more tangential relevance to this case. Docket # 36-1 consists of treatment notes regarding a surgical procedure that Mr. Ruiz underwent in 2006. This exhibit is cited only once in Mr. Ruiz's motion, supporting the proposition that Mr. Ruiz had a surgical removal of his kidney in 2006. Given that there appears to be no dispute between the parties as to this fact, it is unclear to the Court why this fact could not have been established by stipulation or, at the very least, an affidavit by Mr. Ruiz to this effect, rather than by the tender of evidence that would thereafter require restriction. Nevertheless, because the specific contents of this exhibit – the actual description of the surgical procedure – are irrelevant to the issues before the Court, the Court finds that the public interest in access to this exhibit is minimal and that Mr. Ruiz's privacy interest in not disclosing his medical information overcomes the

public interest.  *See Riker*, 315 Fed.Appx. at 755 (where document "play[s] only a negligible role in the performance of Article III duties," the weight given to the public interest in access is low).  Thus, Docket # 36-1 shall remain under restriction.

Docket # 36-5 is Exhibit 19 to Mr. Ruiz's motion.  It consists of progress notes from visits by Mr. Ruiz to Dr. Rubin between May 2014 and September 2017.  It is cited once by Mr. Ruiz in his motion, for the proposition that Dr. Rubin "stated [that] additional bloodwork would be performed in August 2016."  Once again, it is entirely a mystery to the Court why the filing of a lengthy medical record was necessary to support this apparently uncontroverted factual assertion when stipulation or, at worst, redaction of the remaining irrelevant portion of the exhibit could have substituted for restricted access.  Normally, in these circumstances, the Court would deny the motion to restrict and direct the party to publicly-file a redacted version of the exhibit that conceals all private information other than the relevant portion.  But here, the fact of Mr. Ruiz's additional blood testing in August 2016 has minimal, if any, relevance to the analysis herein.  Accordingly, for the same reasons set forth with regard to Docket # 36-1, the Court will grant the motion and allow Docket # 36-5 to remain under restriction.

Docket # 36-6 is Exhibit 20 to Mr. Ruiz's motion.  It consists of a progress note from Dr. David Schmidt regarding a July 7, 2016 examination of Mr. Ruiz, which also seems to incorporate a progress note from Dr. Mull regarding an examination of Mr. Ruiz on June 27, 2019.  As with Exhibit 19, Mr. Ruiz's summary judgment motion cites to this document only once, for the proposition that "Dr. Mull's own records state that Plaintiff will have lab work re-evaluated July and August of this year."  The analysis above regarding Exhibit 19 applies with equal force to this document, and for those reasons, the Court grants the motion and allows Docket # 36-6 to remain restricted.

Finally, Docket # 36-4 is Exhibit 16 to Mr. Ruiz's motion. It defies ready description. It appears to be a list of Woodward suppliers, customers, or other affiliated companies (*e.g.* "Century Fasteners Corp.," "Viking Printing," etc.), grouped into categories identified only with labels such as "ISZCZE," "Jacek Wojas," and "JFELIC." Mr. Ruiz's name, nor the name of any other GSM or other person involved in this case, appears on the document. Mr. Ruiz's summary judgment motion cites this exhibit twice, for the propositions that "other employees could have traveled to Mr. Ruiz's suppliers, which did occur while Mr. Ruiz was still employed with Woodward" and that "Glen Davis was also clearly traveling to suppliers for other GSMs as well."[9] The Court must confess that, even within the context of Mr. Ruiz's citations, it is unable to ascertain the significance of Exhibit 16 in any way. Although the Court would be inclined to find that Mr. Ruiz's perfunctory explanation of the privacy interest that Woodward has in Exhibit 16 – that its public dissemination would "allow[ ] competitors and customers to see how Woodward practices business concerns and would disclose company trade secret information" – is entirely conclusory, the Court nevertheless finds that the inscrutability of Exhibit 16 makes it utterly irrelevant to the issues considered by the Court. Accordingly, for similar reasons as stated above, the Court finds that Exhibit 16 may remain under restriction.

### 2. Docket # 41

This motion seeks to restrict access to three exhibits attached to Mr. Ruiz's response to Woodward's summary judgment motion. Two exhibits are medical records involving Mr. Ruiz

---

[9] Notably, both citations to Exhibit 16 invite the Court to compare it to Exhibit 11, a July 2016 e-mail chain between Mr. Alvis, Glen Davis, and others, in which Mr. Davis reports on his travel plans for attending to specifically-named suppliers (including Hubbell, Mr. Ruiz's supplier). Although this document names several of Woodward's suppliers, no party has requested that Exhibit 11 be restricted.

and one is a Woodward record regarding Mr. Ruiz's travel. These exhibits are docketed at Docket # 40.

Docket # 40 is Exhibit H to Mr. Ruiz's response. It appears to be notes from appointments that Mr. Ruiz had in 2010 with a Dr. Kirby Duvall. This exhibit is cited once in Mr. Ruiz's response for the proposition that Mr. Ruiz "has renal cell carcinoma." (It is cited a second time for the proposition that "Woodward's own medical records for Ruiz also confirm Ruiz's medical conditions," but it is unclear how a document from 2010 can stand for that proposition.) For the same reasons discussed above with regard to Docket # 36-1 and others, the Court finds that this document, although entirely unnecessary, may remain under restriction.

Docket # 40-1 is Exhibit N to Mr. Ruiz's response. It is an untitled spreadsheet that appears to list flight data for trips taken by three Woodward employees (including Mr. Ruiz) between 2015 and 2017. The fields of the spreadsheet are not labeled, but the data in them appears to show travel dates and times, departure and arrival airports, airline identifiers and flight numbers, and what might be the cost of some of the tickets. Exhibit N is cited three times in Mr. Ruiz's summary judgment response, twice for the proposition that "Ruiz traveled just twice in 2015 and only once in 2016" (along with the identification of the destination of each trip), and once for the proposition that Ms. Hice, Mr. Ruiz's replacement as GSM, "traveled on time in 2017, to Denver from Chicago." (Notably, Ms. Hice's name and travel information does not appear in Exhibit N.) Mr. Ruiz argues that this information should be restricted because of Woodward's privacy interests, namely that its disclosure would "allow[ ] competitors and customers to see how Woodward practices business and it would disclose company trade secret information." The Court rejects that argument is insufficiently conclusory. Although the Court again has doubts as to whether it was necessary for Mr. Ruiz to file this exhibit at all – it is not

clear whether the contents of this record were actually in dispute, such that the fact could have been established by stipulation or affidavit,[10] and redaction of the other GSMs name would have been appropriate in any event -- the Court perceives of little apparent injury that Woodward would suffer if this document were publicly-available. The destination airports listed in the document do not reveal anything particularly unusual about Woodward's business interests, and it is unclear to the Court how the disclosure of such information would assist Woodward's competitors to Woodward's detriment. As between a minimal privacy interest that Woodward might hold in this document and the relevance (whatever it may be) of Mr. Ruiz's historical travel to the analysis herein, the public interest in access to this document outweighs Woodward's minimal privacy interest. Accordingly, the motion to restrict access to this document is denied and the restriction on Docket # 40-1 shall be lifted.

Docket # 40-2, which is also Exhibit JJ to Mr. Ruiz's response, is another copy of Dr. Simmons' letter. The request to restrict access to this document is denied for the reasons set forth above.

3. Docket # 45

This motion seeks to restrict access to two exhibits attached to Mr. Ruiz's reply in support of his own summary judgment motion. The two exhibits are filed at Docket # 44. Both documents relate to Mr. Ruiz's medical condition.

Docket # 44, which is Exhibit 38 to Mr. Ruiz's reply, is 40 pages in length. The first roughly 20 pages are an undifferentiated collection of medical records for Mr. Ruiz from an

---

[10]     The Court notes some discrepancy between the contents of Exhibit N and Mr. Ruiz and Mr. Alvis' recitation of Mr. Ruiz's historical travel set forth in the Travel Requirements Document, Docket # 39-8, the latter of which appears to disclose more trips than the former. But the Court need not resolve this discrepancy for purposes of this ruling.

array of providers (including some of the same medical records discussed above), covering a time period from roughly 2010 to 2017. The remaining pages consist of a collection of various documents, including copies of Dr. Mull's, Dr. Simmons, and Dr. Rubin's restriction letters, documents from Mr. Ruiz's personnel file at Woodward regarding immunizations and a post-hire medical exam, drug test control forms, and various other maters. Exhibit 38 is cited in Mr. Ruiz's reply brief on one occasion, for the proposition that the notes from by Dr. Rubin and Dr. Simmons were "produced by Woodward as part of Woodward's medical records of Ruiz, along with a visit log from a doctor's visit Ruiz had with Simmons." In other words, then, Mr. Ruiz tenders Exhibit 38 for the proposition that Woodward's personnel file regarding Mr. Ruiz included copies of Dr. Rubin's and Dr. Ruiz's notes. Once again, tender of a 40-page document was unnecessary to establish a factual contention that appears to be undisputed and capable of resolution by stipulation. Because the vast majority of Exhibit 38 is utterly irrelevant to the issues in this case, and the relevant parts are already in the record, the Court finds that Mr. Ruiz's privacy interests outweigh the public's interest in access to irrelevant material. Docket # 44 may remain under restriction.

Finally, Docket # 44-1 is Exhibit 43 to Mr. Ruiz's reply brief. This 47-page filing consists of an affidavit from Dr. Rubin, attesting to the authenticity of his medical records regarding Mr. Ruiz, followed by 44 pages of records reflecting Dr. Rubin's care of Mr. Ruiz from 2015 through 2017. This exhibit is referenced once in Mr. Ruiz's reply brief, for the proposition that "Rubin confirms that Ruiz's medical records are records of a regularly-conducted activity" (thereby overcoming hearsay objections from Woodward). Few of the medical records Dr. Rubin attaches to that affidavit are germane to this case, and thus, the need to restrict access to this document could have been avoided by redaction or a partial filing of

only the relevant treatment notes.  The Court resolves the motion to restrict this filing as follows: Dr. Rubin's affidavit, as attached to Docket #44-1 is unsigned.  Mr. Ruiz explains that he was required to file the unsigned affidavit in order to meet the reply brief's deadline, and he has subsequently moved **(# 46)** for leave to substitute a signed version of Dr. Rubin's affidavit.  The Court grants Mr. Ruiz's request and directs that Mr. Ruiz publicly file the signed version of Dr. Rubin's affidavit, but <u>not</u> attach the medical records to that filing.  Thus, the affidavit – the purpose for which Exhibit 43 is cited, will be available to the public.  The unnecessarily-filed exhibits at Docket # 44-1, may therefore remain under restriction.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Woodward's Motion for Summary Judgment **(# 34)** is **GRANTED**.  The Clerk of the Court shall enter judgment in favor of Woodward on all claims in this action and shall close the case.

Mr. Ruiz's Motion for Summary Judgment **(# 35)** is **DENIED AS MOOT**.  Mr. Ruiz's Motions to Restrict Access **(# 37, 41, 45)** are **GRANTED IN PART AND DENIED IN PART** as set forth herein.

The Clerk of the Court shall lift the restrictions on Docket # 36-2, 36-3, 40-1, and 40-2; the provision restrictions in place on all other filings shall remain in place.  Mr. Ruiz's Motion to Substitute **(# 46)** a signed version of Dr. Rubin's affidavit is **GRANTED**, and within 7 days of this Order, Mr. Ruiz shall publicly file a signed version of that affidavit, but not the attached medical records.

Dated this 18th day of December, 2019.

**BY THE COURT:**

_Marcia S. Krieger_
_____

Marcia S. Krieger
Senior United States District Judge